[No. 2053.]

WILLIAM ASHWORTH v. THE STATE.

MURDER — HOMICIDE IN DEFENSE OF ANOTHER — CHARGE OF THE COURT.— A defendant in a murder trial is entitled to have explained correctly to the jury the law of self-defense in all the phases in which it may be applicable to the proof. There being testimony in this case tending to show that the defendant fired the fatal shot in defense of his brother, the defendant was entitled to a charge upon that issue, whether or not the court believed the said testimony, and the omission of such charge was reversible error.

APPEAL from the District Court of Houston. Tried below before J. M. Maxey, Esq., Special Judge.

This indictment was presented in the district court of Trinity county, Texas, on the 4th day of November, 1880. It charged that

the appellant, and one Valentine Ashworth, and Josiah Willis, did, on the 30th day of October, 1880, in said Trinity county, Texas, kill and murder one Amos Ashworth, by shooting him with a pistol. A change of venue being awarded to Houston county, the appellant was placed alone upon trial at the spring term, 1884, of the district court of said Houston county. A verdict finding him guilty of murder in the second degree was returned against the appellant, and his punishment was assessed at a term of twenty years in the penitentiary.

Ed. Washington was the first witness for the State. He testified that in the fall of 1880, he lived in Trinity county, from a half to three quarters of a mile distant from the house of Amos Ashworth, the deceased. Late on the evening of the killing of Amos Ashworth, while the witness was at work in his field, he saw three parties pass his field, traveling the Centralia road, and going in the direction of the house of the deceased. The defendant was one of the three parties. He lived in the same direction from witness's place as did the deceased. Some time after the parties passed, the witness heard the reports of fire-arms discharged from the direction of Amos Ashworth's house. Witness then left his field and went to the house of his uncle Ben Ogden. Witness did not go to Amos Ashworth's house until the next day, when he found Amos dead. He aided to shave the face of the dead body, and, while engaged in that task, saw a wound in the head. The ball entered the head at the back and passed out on top. He noticed, also, a discoloration on the side of the neck, which he took to be powder-burn.

Mrs. P. Ashworth, the wife of the deceased, testified for the State that the defendant, with Valentine Ashworth and a man she took to be Josiah Willis, passed the house of the deceased a short time before 12 o'clock on the day of the killing, going towards Centralia. They passed rapidly, hallooing and cursing. Late on that same evening, the witness being on the road returning from the spring to her house, she heard loud cursing and talking on the road, and presently she saw the three parties who passed the house in the morning, viz., the defendant, Valentine Ashworth and the man she took to be Josiah Willis, approaching deceased's place along the Centralia road. The deceased, who was then driving his cattle to the house, met the three parties at the corner of the fence. The parties all stopped, and a dispute, or at least a conversation in which violent oaths were used by the three parties to the deceased, ensued. Witness then requested Mrs. —— Ainsworth to send Hugh Ainsworth to tell the deceased to come to her. The talking be-

tween the several parties seemed to stop for a brief time, and then the witness saw the four parties running towards the deceased's house, the deceased in front. When they passed around the west side of the field and beyond sight of the witness, she heard two reports of a pistol or gun. She saw the smoke produced by the shots but not the shooting. Defendant, Valentine Ashworth and Josiah Willis ran off down the road, after the killing. The deceased was killed in Trinity county, Texas, about two hundred yards from his house, on the 30th day of October, 1880. Witness, who was *enceinte* at the time of the killing, did not see the body of the deceased.

Cross-examined by the defense, the witness said that she was back of the garden when the several parties to the tragedy met, and that between the place of the meeting and the place where the witness was, there was a row of plum trees. In passing the deceased's place on that morning, the defendant and his two companions traveled what is known as the Alto and Sumpter road, which is the usual route to Centralia from that neighborhood. They frequently went to Centralia over that road. The deceased had been to mill on that morning, but had returned and had gone into the woods to haul a load of fuel, when the parties passed going to Centralia. Witness went to the woods and told deceased that the parties had passed the house, cursing and shooting, to which the deceased made no reply. He shortly afterwards returned home with his fuel and turned his horses out. After a short time he joined the witness, Mrs. Ainsworth, Hugh Ainsworth and some children, in the cotton patch, and picked a few pounds of cotton. Shortly after he reached the cotton patch witness told him that Mr. Lindsey had informed her that one of deceased's steers had worms in his neck. Deceased then told one of Mrs. Ainsworth's boys to drive up one of his horses and saddle it. This being done, he mounted his horse and left, telling witness he was going to drive up his stock. He went down the lane which led into the Sumpter and Alto road. It was on his return home over the same route that he met the defendant and his confederates, at the northwest corner of the fence. Deceased was then traveling north, driving his cattle towards his home, and the defendant, Valentine and Willis were traveling south. Witness heard loud talking when the parties met, and saw the parties after they started on the run towards the house. It was after this that the shots were fired, and after the shots were fired the witness saw the defendant, Valentine Ainsworth and Josiah Willis running off down the road. Witness did not know whether or not deceased

took his gun with him when he went to hunt his cattle. At the time that the parties met at the corner of the fence, Mrs. Ainsworth and Hugh Ainsworth were near the crossing of the fence between the Ainsworth homestead and that of the deceased.

Hugh Ainsworth was the next witness for the State. He testified that he saw the difficulty which culminated in the killing of Amos Ashworth. It occurred near Amos Ashworth's house in Trinity county, Texas, late on the evening of Saturday, October 30, 1880. The defendant, Valentine Ashworth, and the man who witness afterwards learned was Josiah Willis, met the deceased, who was then driving his cows home. They were cursing the deceased. The parties all stopped and talked a few minutes at the place of meeting, and then all of them started towards deceased's house, the deceased riding in front. At or about the moment they started towards the house, the witness heard the deceased say: "Billy, you thief you, you have trampled on me." He, deceased, then struck a lope towards home. A shot was immediately fired, but by whom the witness did not know. A very short time after the first shot was fired, witness saw the defendant extend his hand towards the deceased, and heard him say: "G—d d—n you, I *will* kill you." At that moment a second shot was fired. All of the parties were running at the time. Just before the shooting the witness saw Valentine Ashworth ride up to the deceased and place his hand on deceased's shoulder, and heard him say to deceased: "You are mine." At that same moment of time the man whom witness afterwards learned was Josiah Willis ran around the deceased and attempted to seize the bridle of deceased's horse. The deceased fell from his horse immediately after the second shot was fired. Witness was not exceeding thirty-five yards distant from the parties when the first shot was fired, and was not so far when the second shot was fired. There was nothing in the way to obstruct witness's view. Witness saw the body after death. The ball entered the back of the head and passed out through the top of the head. Witness reached the deceased just after he fell. Witness's mother, Mrs. Ainsworth, was the next person to reach the body, and Sam McBride and the two Torry boys were the next. Defendant, Valentine Ashworth and Josiah Willis ran off after the shooting. The burial of deceased occurred on Monday following the Saturday of the killing. Neither of the parties charged with the murder attended the funeral. Neither of them aided in taking the deceased to his house after his death.

Cross-examined, the witness said that he attained his sixteenth

year in January, 1885. He was something over eleven years old when the killing of Amos Ashworth occurred, in the fall of 1880. The deceased went to mill on the morning of the day of his death. Witness was at his mother's house, one hundred yards north of deceased's field, when the deceased returned home from the mill. After dinner, on that day, the deceased went east from his house after a load of wood. After hauling a load of wood, and turning out his horses, he went to the cotton patch where his wife, witness and witness's mother were picking cotton. While there, he was told by his wife that Mr. Lindsey had sent him word that one of his steers was suffering from worms. Deceased then sent a little brother of witness for one of his horses, which he mounted and rode off, saying that he was going to drive up his stock. Locating, on a diagram handed him by counsel for the defense, the point where he and his mother stood when the deceased was killed, the witness thought that it must have been one hundred yards from where they stood to where deceased was killed. Mrs. Ashworth was on her way to her house with some clothes she had washed, when the killing occurred. Witness did not see the party who killed the deceased until they met him, but heard them coming down the road. Deceased had his gun on his left knee, holding the barrel with his left hand, when the parties met. Deceased had his gun in that same position when he was shot by the defendant. After the killing the witness saw the deceased's gun, a pistol and a pair of saddle-bags lying on the ground near the body. Witness, by counting fast, could have counted one hundred from the time the parties met until the fatal shot was fired. When the witness got on the fence *en route* to the body, he saw a man standing by the side of the road holding a bald-faced black horse. The man mounted the horse and rode off south. When he reached the body the witness saw an old gray bearded man go up from the branch into the woods and back to the branch. He knew neither of those men. When witness saw the man with the black horse, the defendant, his brother and Willis had gone.

Re-examined, the witness stated that he was not farther from the parties than thirty-five yards when the first shot was fired, and was nearer when the other shot was fired. Defendant, Valentine and Willis were entirely gone when the old man came up from and went back into the branch. The fence crossed by witness on his way to the body was the fence between the places of the deceased and witness's mother.

John B. Parker testified, for the State, that he reached the house

of the deceased on the night of the tragedy. When he arrived the body was lying in the entry. Deceased had been shot through the head, from the back through the top. Witness examined deceased's gun, and found caps on both tubes. The deceased's six-shooting pistol contained five loads. The tube to the remaining chamber was stopped, but witness thought that it too was loaded. Witness knew that to be deceased's pistol only from hearsay. Witness thought that the gun was loaded. It had not been recently discharged.

Sam McBride was the next witness for the State. He testified that he was between a half and three quarters of a mile distant from the house of the deceased when the latter was killed. He heard the two shots fired in rapid succession, and went at once to the place of the killing in company with the two Torry boys. He found Amos Ashworth lying dead in the road, about two hundred yards distant from his house. Mrs. Ainsworth and two or three of her children were with the body. Witness saw the gun of the deceased lying near the body, but did not examine it closely, though it did not have the appearance of having been recently discharged. Witness returned to the house of the deceased that night and examined the gun. He noticed then that the gun did not have the appearance of having been recently discharged. Both tubes were capped. Witness saw a pistol and a pair of saddle-bags lying near the body of the deceased in the evening, and saw them again at the house that night. The pistol did not have the appearance of having been recently discharged. Witness saw a powder-burn on the neck of the deceased, just under one ear.

Cross-examined, the witness testified that the first shot fired did not sound like the report of a shot-gun. Witness could detect no difference in the sound of the two reports. Witness remained with the body some ten or fifteen minutes in the evening and returned after night, when he examined the gun by the light of a brass lamp. Witness could not positively say that neither cap had been exploded, but the gun had no appearance of recent discharge.

Gid Gibson testified, for the State, that he went to deceased's house on the evening of the killing. He found deceased's body lying in the road. A ball had passed through his head. A wisp of the deceased's beard appeared to have been cut from the side of his face, and his neck near it had the appearance of being powder-burned. Witness found the gun of the deceased standing in a fence corner near the body. He examined it, and saw Mr. Goodson, now dead, who was present, drop the ramrod in both barrels,

disclosing the fact that both were loaded, one more heavily than the other. On the next day witness tried to remove the caps from the tubes but he failed. He examined the deceased's pistol next day and found five chambers loaded, and the other chamber stopped up. It had not been fired off lately. Neither defendant nor Valentine nor Willis were at the house at any time while witness was there. Joe Davis, Sam McBride, Mr. Goodson and his step-son were there when witness arrived. The deceased's eyes were in a very bad condition when he was killed. He was nearly blind. Witness was an uncle to the deceased and a cousin to the defendant.

Cross-examined, witness said that he left his home, three or four miles distant from deceased's house, to go to deceased's, about dark. When he reached the body the gun, which witness knew to belong to the deceased, was standing in the fence corner. Witness's feelings towards the defendant were not of the tenderest nature. He could not feel kindly towards any person guilty of acting as defendant and his brother Valentine had.

R. T. Chandler testified, for the State, that he was sheriff of Trinity county in 1880. He had warrants for the arrest of the defendant, but failed, on diligent search, to find him until about eighteen months after the killing, when he found and arrested him in Louisiana.

Hugh Ainsworth, recalled by the State, testified that when the parties to the tragedy met, he, with his mother and Mrs. Ashworth, were near the fence crossing. Mrs. Ashworth asked him to go and tell deceased to come to her. He had progressed on his errand to a point within thirty-five yards of the parties when the first shot was fired. The deceased at no time during the difficulty changed his gun from its original position on his left knee.

Joe Davis testified, for the State, that he reached the body before it was removed from the road to the house. Besides the wound through the head described by previous witnesses, this witness saw a mark on the left side of deceased's neck, which was evidently made by a glancing shot. That shot discolored the neck and cut the beard. Witness saw the gun of the deceased at his house that night between 8 and 9 o'clock. The gun was handed to him by Gid Gibson for examination. It was a three-fourths caliber double-barreled gun. Both barrels were loaded, one apparently charged with a heavier load than the other. The caps on the tubes were old, and appeared to be corroded. That gun had not, according to appearances, been recently discharged. The witness saw, but did not examine, the pistol at the deceased's house.

The witness had long known both the defendant and the deceased. He saw and conversed with the defendant in Centralia on the Saturday previous to the fatal Tuesday. Defendant was then drinking somewhat. He asked if the witness had seen a paper which the deceased was reported to be circulating for signatures, seeking the expulsion of defendant and his brother Pink from the country. He then told witness that he construed the paper which defendant was circulating as a petition to citizens to expel him and his brother Pink from the country, and, " G—d d—n him," meaning deceased, " I will get him yet. He will never try to run any one else out of the county." The witness had seen a paper to which the deceased had solicited signatures. That paper was aimed at no named parties, but at unnamed parties who, it was claimed by deceased, had been depredating on his property. Witness so informed the defendant.

Cross-examined, the witness testified that the discoloration he saw on the deceased's neck was not, in his opinion, a powder-burn. It was a yellowish-blue mark, was under the skin, and appeared to be a coagulation of blood,— " it was blood-shotten." It was about an eighth of an inch in width. The whiskers of the deceased about that mark appeared to have been burned out with something. They were shorter there than elsewhere on the face. Whiskers, the witness knew, were rarely, if ever, worn of equal length over a man's face, and it was doubtless a difficult task to cut whiskers without " notching " them in places. Witness did not know to whom defendant alluded when he said that Amos Ashworth would not try to run anybody else out of the country. It was the belief of the witness that, though it named no one, the paper circulated by the deceased referred to the defendant and his brother Pink. He had heard the deceased say that the defendant and his brother Pink had burned his fence, stolen his property, and cut out the tongue of one of his horses, and that the petition was an appeal to the good people of the county to protect him from such outrages, by taking some decisive action in the event such depredations upon his property were repeated. While the deceased was regarded in the community as a resolute and determined man, he was esteemed a peaceable, quiet and law-abiding citizen. Witness had heard that Castleberry fled the country upon being charged with committing a forgery, but he had never heard that the deceased accused either Slater or Castleberry of criminal conduct. The skin along the blood-shot mark on deceased's neck was not broken. The whiskers were cut on an exact line with that mark.

Miss S. J. Ashworth, the sister of the deceased, was the next witness for the State. She testified that she accompanied the deceased and his wife to church on one Sunday in January, 1880. As they passed the house of Mrs. Trawick, *en route* to church, they saw the defendant, his brother Pink, Martin Willis and Marion Perkins in the yard, engaged, she thought, in a game of marbles. On seeing deceased, wife and witness, the parties named ran out of the yard, mounted their horses, rode around the crib into the road, and headed and halted the party by ranging their horses across the road. Pink Ashworth said to the deceased: " I understand that you have been talking about us again. I thought we had dropped that matter, and agreed to say no more about it." Deceased replied: " It is a d—d lie. Who is your authority?" Pink replied: "Marion Perkins." Deceased retorted, telling Pink and defendant to dismount and he could whip them both. The three dismounted, when Pink advanced on deceased, and a short struggle, in which two or three blows were struck, ensued. Defendant, during the struggle, struck the deceased with his quirt. After the parties separated, deceased said to the defendant: " This is the second time you have waylaid me, and I intend to report you." Defendant replied: "If you do, I will kill you," repeating the threat in the same words several times.

Cross-examined by the defense, the witness stated that Mrs. Trawick's house was about one hundred yards from the road which she, deceased and his wife were traveling on their way to church. A bad state of feeling existed between the deceased and his cousins, the defendant and Pink Ashworth. Mrs. Ainsworth, the mother of Hugh Ainsworth, who was frequently referred to by previous witnesses, was dead. The State rested.

Warren Torry was the first witness for the defense. He testified that he, his brother and Sam McBride were together about a half mile from the deceased's house when two shots were fired in rapid succession. They went immediately to the place of shooting, and found the deceased lying dead in the road near his house. Witness on his arrival took up a gun from the ground near the body and examined it. He pulled back both of the hammers and found that one tube was and the other was not capped. The barrel to the uncapped tube, the witness thought, was unloaded, and it had, to the witness, the appearance of having been recently discharged. Witness could tell by the appearance of the tube whether or not a gun has been recently discharged. McBride remained at the body but a short time. It was after the departure of McBride that witness examined the gun. After examining it, the witness stood the

gun up in the corner of the fence near where he found it. Witness saw a pair of saddle-bags near the body, and a pistol near the saddle-bags. He did not examine the pistol.

Crossed by the State, the witness testified that he refrained from examining the pistol for the dual reason that he was unfamiliar with such weapons and feared prosecution if seen with a pistol in his hands. Witness's brother, Marshall, was present and examined the gun with witness. Witness did not test the gun with the ram-rod, nor did he examine the muzzle.

Marshall Torry testified, for the defense, that he went to the body of the deceased, in company with his brother Warren and Sam Mc-Bride, soon after the two shots were fired. Those shots were fired in quick succession. Witness examined the wound of the deceased, and saw a gun, a six-shooting pistol, and a pair of somewhat worn saddle-bags lying near the body. One barrel of the gun had the appearance of having been recently discharged.

Cross-examined by the State, the witness testified that he saw his brother take up and examine the gun. Gid Gibson was not then present. McBride left before the gun was examined. The witness was satisfied in his own mind that one barrel of the gun had been recently discharged. The tube to that barrel was capless. Witness did not know what became of the exploded cap, but he knew that he saw it. It was his impression that the exploded cap adhered to the cup of the hammer, when the hammer was raised by his brother. He did not, himself, have the gun in his hand. The witness was dis-tant from the parties about a half mile when the shooting occurred. Just before the shots were fired he heard men hallooing, and just after the shots he heard women and children screaming. Miss Kitty Moore reached the body shortly after the witness and his brother arrived. The witness did not examine the pistol, and could give no reason for not doing so.

William Dew testified, for the defense, that he had lived in Trinity county since 1853, and had long known the deceased, and lived within three and a half miles of his house at the time of his death. A short time before his death the deceased brought a petition to witness's house and requested witness to sign it. He explained that the object of the petition was to inaugurate a movement to suppress depredations upon property being committed in the county, and that he wanted to obtain the signatures of all the old settlers. His ob-ject was to have the petition signed, and to bring about a meeting of the signers at Popham's bottom farm to express in resolutions their purpose to suppress depredations. Witness asked the deceased

who were the parties that had been committing depredations. He replied: "Uncle David's boys (meaning defendant and Pink Ashworth) and a young man named Willis;" that they had burned his fence, stolen his property and mutilated his horse by cutting out the animal's tongue, and that he wanted the good citizens of the county to meet and devise means of stopping such outrages. Popham's field, where it was proposed to hold the meeting, was about three and a half miles distant from deceased's place. Witness, remarking to deceased that his uncle David was a good man, advised him to lay the matter before him, and appeal to him to control his boys and Willis. Deceased remarked, in reply, that he recognized his uncle David as a good man, but, unfortunately, he was controlled by his family. Witness declined to sign the petition, with the remark that he could not become a party to the proceeding proposed, and advised the deceased as a remaining alternative to appeal to the courts of the country. Deceased replied that he proposed to stop it if he had to call his double-barreled shot-gun into service. Slater and Castleberry left the country about the time that the deceased accused them of stealing his property. Witness had never seen a horse belonging to the deceased with his tongue cut out. He had never seen any evidence of his fence being burned or his goods being stolen, and had never heard such outrages imputed to the defendant, Pink Ashworth and Willis, except by the deceased. The deceased was a perfectly good, law-abiding man so far as witness knew. Witness did not know that Castleberry fled the country on being charged with forgery.

Thomas Trawick testified, for the defense, that he saw the deceased at Pharr's mills, on the morning of the day on which he was killed. Deceased in conversation with the witness said that defendant, Pink and Valentine Ashworth had passed his house several times, cutting up and hallooing, and that, unless they changed their conduct in this respect, he intended to disable them from doing it again. He asked witness to tell the defendant and his said brothers so for him. Witness declined to take the message.

Cross-examined, the witness testified that the conversation recited occurred about 9 o'clock on the morning of the killing, at Pharr's mill, about two and a half miles from the residence of the deceased. Witness left the deceased at that mill at about 10 o'clock. Witness was not related to the defendant. His sister married the defendant's brother, and the witness's wife was a cousin to the defendant. The defendant and the deceased were cousins.

Pink Ashworth, the defendant's brother, was the next witness in

his behalf.   He testified that he was present when County Surveyor George Gibson measured certain distances at and about the place of the killing.   From the fence crossing between the places of the deceased and Mrs. Ainsworth, at the point where it was testified that Mrs. Ainsworth and her son Hugh were when the parties charged with the killing met the deceased, to where the deceased was shot was two hundred and forty yards.   From the point where the deceased fell, the distance to his house was something over two hundred yards.   The witness was present when the deceased, his wife, and his sister, Miss S. J. Ashworth, encountered defendant and others on their way to church, near the house of Mrs. Trawick — the occasion of the collision testified to by Miss Ashworth.   The defendant, witness and party did not go through the woods to intercept the deceased, wife and sister.   On the contrary they started to church, traveling a road which took them into the road traveled by deceased and party, about seventy-five yards distant from Mrs. Trawick's house.   Witness said to deceased, when the parties met on that occasion: "I am told that you have been talking about me and my brother again.   I thought we had agreed to drop that matter." Deceased replied that the witness's informant was a d—d liar, and asked who he was.   Witness told him that Marion Perkins was his informant.   Deceased then said: "Get down; I can whip both of you."   The three parties dismounted, and witness and deceased engaged in a little fisticuff.   Defendant did not strike deceased with his quirt during that fight.   Before the difficulty was entirely over, defendant's horse escaped, and defendant left in pursuit.   The defendant did not tell deceased that he would kill him if he, deceased, reported him, defendant.   Witness was not present at the killing.

Josiah Willis was the next and most important witness for the defense, and the last examined on this trial.   He testified that he first came to Texas from Louisiana, in 1880, with his mother on a visit.   He remained but a few weeks, and took his mother back to Louisiana.   He returned to Texas some three or four weeks before Amos Ashworth was killed.   Witness went to the town of Centralia with the defendant and his brother Valentine on the evening of the killing.   Both going to and returning from Centralia they traveled the road which skirted the deceased's fence.   They remained in Centralia about one hour.   The witness was riding in advance of the defendant and Valentine, when, on their return from Centralia, they reached the fence inclosing the place of the deceased.   About that time the witness heard some one halloo, and very soon came in view of the deceased, who was approaching from the direction in

which witness, defendant and Valentine were going. Deceased had his gun on his knee. Deceased passed the witness, who was some twenty-five or thirty steps in advance of the defendant and Valentine, making no reply to witness's greeting nor halting until he reached a point immediately in front of the defendant and Valentine. Here he stopped, and witness heard him say: "Bill Ashworth, you d—d hog thief, have I not told you that you shall not travel this road?" About that time, the witness, who was riding on slowly, saw the deceased throw his gun across his lap. Valentine Ashworth at the same time dismounted, ran under his horse's neck, and caught or caught at the deceased's gun, and the witness heard the report of the first shot. At the very moment that this first shot was fired, the witness was looking ahead. He turned immediately and saw smoke ascending from the ground, in which direction the muzzle of deceased's gun was pointing. Almost instantly the second shot was fired, and it was fired by the defendant from a pistol.

Cross-examined, the witness testified that it was about 1 o'clock when he, defendant and Valentine Ashworth passed deceased's house going to Centralia. They remained in Centralia about an hour, possibly a little longer. They bought some whisky in Centralia, and each had taken a drink. The witness was indicted for the murder of Amos Ashworth, but had been tried and acquitted.

The motion for new trial raised the question discussed in the opinion.

D. A. Nunn, for the appellant.

J. H. Burts, Assistant Attorney-General, for the State.

Willson, Judge. There is evidence in this case tending to prove that the defendant fired the fatal shot in defense of his brother, Valentine Ashworth. This evidence is furnished by the testimony of Josiah Willis, who was present at the time of the homicide. He states, in substance, that deceased, who was armed with a double-barreled shot-gun, assaulted Valentine Ashworth with said gun, fired one shot, and was struggling with said Valentine, who had seized, or was attempting to seize, hold of the gun, when defendant shot and killed the deceased with a pistol.

We think this testimony clearly and directly presents the issue that the defendant committed the homicide in defense of his brother, and whether such testimony be true or false, it demanded a charge

submitting the issue to the jury, and explaining the law relating thereto. No such charge was given. A very brief, and, we think, incomplete, instruction upon the law of self-defense was contained in the charge, but this confined the jury to a consideration of whether or not the defendant acted in his own defense. It was the right of the defendant to have the law of self-defense, in all the phases in which it might be applicable to the proof, explained to the jury fully and correctly. (*King* v. *The State*, 13 Texas Ct. App., 277; *Edwards* v. *The State*, 5 Texas Ct. App., 593; *Guffee* v. *The State*, 8 Texas Ct. App., 187; *Foster* v. *The State*, id., 248; *Kemp* v. *The State*, 11 Texas Ct. App., 174; *North* v. *The State*, 12 Texas Ct. App., 111; *Sterling* v. *The State*, 15 Texas Ct. App., 249.)

Because of this material omission in the charge of the court, the conviction must be set aside. There are also other supposed errors in the charge of the court, complained of by the defendant, which we shall not take time to discuss, as they are not of sufficient importance to require investigation, in view of the disposition to be made of this appeal, and because such errors are not of a character likely to be repeated on another trial.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered October 31, 1885.]